HARRIET M. KRAEMER, PETITIONER-APPELLEE, v. NITRO-FORM COMPANY, INC., RESPONDENT-APPELLANT.

Essex County Court
Law Division

Decided November 12, 1954.

*Mr. Alexander Avidan* argued the cause for petitioner-appellee (*Messrs. Avidan & Avidan,* attorneys).

*Mr. Isidor Kalisch* argued the cause for respondent-appellant (*Mr. Edward B. Meredith,* attorney).

FOLEY, J. C. C.  The petitioner's decedent was killed in an explosion in the respondent's plant.  An award was entered in the Workmen's Compensation Division according dependency benefits on behalf of herself and two children. The primary question in controversy on this appeal is whether the decedent was an employee of the respondent at the time of his fatal accident or was gratuitously contributing his time and efforts in order to foster the growth of an enterprise of which he was a part owner.  An understanding of the problem involved requires a brief discussion of the genesis and ownership of the respondent corporation and the relationship of the decedent to the prosecution of its objectives.

The respondent evolved from a four-man partnership that had been formed for the manufacture of chemicals, the partners becoming the four incorporators and officers of the corporation and the owners in equal amounts of all of its

capital stock. The capital and plant were a legacy from the partnership and the latter venture had been launched on a modest investment by the partners. The testimony reveals that the decedent and Tully, another officer, had other full-time employments from the time of the incorporation to the day of the accident. Tully was an associate professor of chemistry in the Newark College of Engineering, while Kraemer was in charge of the chemistry stockroom at the college and was supervised in that activity by Tully. A person named Mahoney was president of the corporation, Kraemer was secretary and treasurer, one Ross, vice-president in charge of sales, and Tully, vice-president in charge of research.

It was not until the trial was under way that the respondent took issue with the claim that Kraemer had been its employee. The answer to the claim petition admitted that the accident arose out of and in the course of decedent's employment and set forth that the statutory funeral allowance had been paid. Only the question of dependency was there raised, the reasons given being that respondent had no knowledge concerning the alleged dependency, and that since no wages or salary were paid during the period of employment there was no liability to make dependency payments. Preliminary to trial of the cause that position was again asseverated in a statement by counsel for respondent that only dependency and rate were in question. It was during the course of the testimony that respondent moved to withdraw any admissions of employment that had been made by answer or stipulation, thus reducing its concession to the bare facts that the decedent was working in the plant and came to his death in the explosion. The motion was granted.

In support of her claim that the decedent was a wage-earning employee of respondent, the petitioner relied on the testimony of Tully, one of the two surviving members of the incorporator group. The respondent introduced no evidence to counter her case.

Tully testified that the respondent was engaged in the manufacture of one chemical which was used in producing explosives and as a reagent in rocket propulsion. A backlog

of orders was on hand. Kraemer and Mahoney were the chief workers at the plant and up to the time of the explosion were the only ones who had done any considerable work for the company. Occasionally others were called in to help, but the witness was able to recall the names of only two such extra helpers, namely, Mahoney's father and a Donald Austin. Ross did very little work at the plant; he took care of outside sales work. The witness did not describe his own activities. Kraemer discharged a variety of duties. He kept the books, looked after correspondence, did carpentry and other construction work in the factory, and assisted Mahoney in turning out batches of the chemical. During the lifetime of the corporation Kraemer spent 20 hours per week at the company's plant. The witness explained that this was an average figure, and that though slight variations upward might occur from time to time, it represented the amount of time generally required to take care of the business on hand.

His testimony further reveals that the four associates had entered into a verbal compact that all would be paid a reasonable wage for work done for the company, but that for the purpose of building up the operating capital the men agreed not to draw out their accrued wages for the time being. It was their common plan that if the business proved to be successful all of them would ultimately become full-time employees on a salary basis. He also stated that though no definite time had been agreed upon for the payment of wages, there had always been enough money on hand to pay Kraemer and Mahoney a reasonable wage.

The major attack made by the respondent on the judgment of the Workmen's Compensation Division is founded on the premise that Tully's account of an agreement made among the several stockholders to pay wages to Kraemer is entirely incredible. It is contended that the only plausible conclusion that can be drawn from the testimony is that an informal discussion among them had resulted in an expression of hope that, if prosperity should bless their undertaking, one and all of them would be engaged by the corporation as full-time employees.

The respondent does not dispute the averment that Mahoney and Kraemer had been the mainstays in carrying out the production on which the company's life depended, and that Kraemer was the person who looked after the correspondence and account books of the company and performed miscellaneous jobs as need dictated. It is entirely inferable that the distribution of labor among the men who had staked out equal claims in the future of the company was extremely one-sided. While they were all striving for equal future increments, it is not strange that they should have accorded a reasonable wage to the men who were giving steadily of the present in order to make future enhancement possible. Tully's account of the accord is so highly favored by one's sense of equity that it is easy of acceptance. There is nothing in the evidence that would justify adoption of the respondent's suggestion as to what the agreement probably was. Either the conversation related took place or his narrative is entirely fictional.

Respondent urges that certain peripheral circumstances cast doubt on the conclusion that the employment arrangement was made. It is pointed out that the agreement was not in writing, that there was no formal corporate action taken to memorialize the event, that the wage was not set in terms of dollars and cents per hour, and that no running record was kept of the amount of time actually put in by these workers. In other circumstances and under other conditions these might constitute cogent reasons for questioning the probity of Tully, but they have no impulsive power to that end in this case. The persons who allegedly made this compact are all of the incorporators, all of the officers, and the sole owners, of the respondent. They had been associated as partners before the formation of the corporation. There is nothing to show that they felt obliged to deal at arm's length with one another. They were responsible only to themselves. When dealing among themselves it is most natural that they would be informal and would not have recourse to the stiff and cumbersome forms and procedures that mark the conduct of corporate affairs where diversity of ownership and com-

plexity of organization require exact recording of events and minute accounting to others. So, too, it seems not unnatural that the arrangements that concerned only themselves and their wholly-owned enterprise should have embraced the rather lax provision that a reasonable wage would be paid and that no time-card method of recording working hours would be used. Bargaining was not of the essence of this agreement, nor was personal advantage or preferment. Their goal was a common one. The part-time employment of some of them was looked upon as a transitory stage in the young company's existence, to which the setting of an exact wage and the accurate recording of time expended were probably deemed to be unessential. From previous experience they knew the amount of work and time involved in turning out their product and in attending to the other essential affairs of their business. Tully testified that an average of 20 hours per week would see the job done. This is consonant with the testimony that Kraemer devoted only Saturdays, Sundays and holidays, and occasional evenings to the work. The criticism by respondent that Tully was testifying from hearsay when he estimated decedent's average weekly performance at 20 hours, because Tully was not present except on occasions, seems captious when it is considered against the entire factual background made out by the proofs.

The respondent's brief contains overtones suggestive of fraudulent conduct in connection with its discussion of the failure of the petitioner to produce the corporate records, the respondent supplying the assumption that the failure stemmed from the realization that their production would be hurtful to her case. In view of the explanation offered by Tully for the lack of records, the respondent's suggestion amounts to a charge of suppression of evidence. Tully is taken to task as a witness who is prejudiced against the respondent. His credibility is rendered suspect, it is said, by the failure to corroborate his assertion that the records were actually destroyed in the explosion, and by the claim that he gave a different explanation for not having the records when he

testified in a similar case brought by the dependent widow of Mahoney, to wit, that the record books had been taken by the police and had not been returned. It was because of this obvious conflict in testimony that the respondent besought this court to consider the testimony in the two cases together and to determine the credibility of Tully in the light of both records, or, if necessary, to remand the cases to the Division for further cross-examination of Tully.

It is immediately obvious from a perusal of both records that the respondent was not greatly interested in the whereabouts or the fate of the records when the cases were tried. No cross-examination was conducted on the subject on either trial. In each case the explanation was elicited by the petitioner and allowed to stand unchallenged. Four months elapsed between the trials of the two cases. Counsel of record was the same in each case, though different trial attorneys handled the cases for the respondent in the tribunal below. The opportunity was available in each case to cross-examine Tully and second trial presented an enhanced chance to test the credibility of the witness in view of his earlier discordant testimony. Falsification by the witness is not demonstrated by the facts and circumstances here prevailing. On each occasion he may have been truthfully testifying in the light of his knowledge at that particular time. If prejudice motivated the witness, and if false swearing was resorted to to serve that prejudice, opportunity to expose the bias and falsehood twice waited upon respondent, but in each case it was rejected. The fact that new counsel on appeal may have entirely different conceptions as to how the case should have been tried, affords no reason to remand the matter for a retrial for the purpose of applying his ideas.

There is a lack of logical appeal in the respondent's position on this point. Moreover, this court lacks the right to consolidate the appeals or to remand the cases for the purpose cited. The power of the County Court to review a workmen's compensation case is conferred by the Legislature and the scope of the review is delineated in the enabling statute. While the statute does not define the circumstances

under which remand may be made, the power has been construed to exist in cases where legal error tainted the proceedings below. But there is no precedent for the proposition that a cause should be sent back to the trial court merely on the showing that additional testimony is desired by one or both of the parties.

My study of the transcript leads me to the same conclusion as that reached by the deputy director, namely, that the agreement to pay wages for part-time work was made and that Tully's account of that agreement is entirely acceptable.

I am not impressed by the respondent's criticism of the lower court in permitting Tully to give an opinion of the reasonable hourly wage merited by the decedent's labors. It is difficult to think of one more capable of assaying the value of the services than this part-owner of the company who had been identified with its operations from the beginning. He knew what duties the decedent performed; so, too, it is fairly inferable that he knew his capacity to perform those tasks and what they were worth to the respondent. But the witness's qualifications did not stop there. The decedent, as has already been stated, worked under the supervision of the witness at the college where both were employed. It is worthy of observation that the amount set by the witness was a modest one when there are taken into account the nature of the multiplex services performed and their importance to the welfare of the company.

Another objection made is that the petitioner failed to offer competent proof of the corporate status of the respondent. My perusal of the record indicates that that question was never in issue. The petition was directed against the corporation. Nothing was asserted in the answer to suggest that respondent denied that it was a corporation and, as a matter of fact, the answer was executed by "Nitroform Company, Incorporated" and verified by one who identified himself as the "attorney for the respondent named in the foregoing answer to claim petition." The status of respondent remained uncontested after its successful motion

to withdraw its previous concessions that the petitioner was its employee. While it is true that there was an objection made to marking in evidence an uncertified copy of the certificate of incorporation, it must be noted that the offer followed its use by Tully solely for the purpose of refreshing his recollection of date when the corporation was formally launched. Elsewhere in the testimony Tully had testified, without objection, to the facts of incorporation and the respective positions in the management of the business held by the four incorporators. The form and substance of several questions asked by respondent's counsel show that the fact of incorporation was conceded. Formal proof of the legal attributes of the adverse party is not required unless the status alleged has been put into the field of controversy by denial. While the current proceeding is a trial *de novo*, its ambit cannot be broadened to include issues not comprehended by the moving papers or the conduct of the trial.

The last point made by the respondent is that the Deputy Director was in error in using a minimum five-day week as the basis for computing the compensation rate. The objection is dealt with cursorily, the respondent being satisfied with declaring that there was no evidence to support the conclusion that any of the men had worked any number of hours or any number of days in a week. The argument then hurries off tangent-wise to the proposition that the services rendered were given gratuitously in order to advance their respective interests in the business.

The conclusion is inescapable that the provisions of the Workmen's Compensation Act dealing with computation of rate of compensation are built around the idea that a minimum wage-week of five days shall be the basis used in cases involving employment for less than five days per week. The case of *Bennett v. Fertig*, 10 *N. J. Misc.* 1021 (*Sup. Ct.* 1932), affirmed 110 *N. J. L.* 510 (*E. & A.* 1933), lays at rest any speculation to the contrary. Reason favors the rule that the wage base should be of equal breadth whether the employee happens to be in a single employment of weekly length or is engaged in one or more employments for lesser

periods. The effect of an accident on an injured workman in either case is the same. The superficial circumstance that the employment in one case is part-time cannot be allowed to produce the bizarre result of paying a rate of compensation which would be far below that given one who was employed on a weekly basis. *Cf. Scott v. Public Service, &c.*, 6 *N. J. Super.* 236 (*App. Div.* 1950) ; 2 *Larson, Workmen's Compensation, sec.* 60.11, *p.* 71.

██ Since there is no provision dealing specially with a part-time employment made up of an aggregate number of hours per week, resulting from the employee's attendance on the job for varying periods of time, it must be concluded that such hours of service are to be expressed in terms of full days of work so that the basic daily rate may be arrived at and the minimum weekly wage be thereon computed. I am of opinion that the deputy director used the proper wage base in determining the amount of compensation.

A judgment may be submitted in conformity with the views herein expressed.